𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

SOUTHERN RAILWAY COMPANY V. COMMONWEALTH OF VIRGINIA.

September 16, 1920.

1. WORDS AND PHRASES—"Abandon."—The word "abandon" means to give up, to cease to use.

2. RAILROADS — Station — Abandonment of Station — Relocation.— Every relocation of a station, whether in the same community or not, strictly speaking, is a change of location or site, and therefore an abandonment of the old site, but there may be changes of location so slightly to the prejudice of any portion of the community, and on the whole so beneficial to the majority of the public having business at the station, that they will not be regarded as abandonments, but as relocations. Particularly would this be true where the changes made are minor changes and the station, if the old site is entirely abandoned, is removed but a negligible distance.

3. RAILROADS—Station—Abandonment of Station—Relocation.—But obviously there may be changes in the same community of so serious a nature, involving the rights of the public to so considerable a degree, and affecting them so prejudicially, that they must be regarded as abandonments, and not permitted as relocations and as such remitted solely to the discretion of the railway companies.

4. RAILROADS—Station—Abandonment of Station—Relocation.—The decision in each case must rest upon the facts of that case, and if there is an authority created by law to deal with cases of abandonment, that authority cannot be ousted of jurisdiction to make investigation by the suggestion that the case is a relocation and not an abandonment. This investigation may affect the "ultimate order, but not the jurisdiction, of the properly constituted authority."

5. RAILROADS—Station—Abandonment and Relocation—Among the determining factors of an inquiry whether a given removal of a station is an abandonment of the old station or a relocation will be the distance to which the station is removed, the number of patrons prejudicially affected by the removal, and

the extent of their injury or damage. Removal to a considerable distance, accompanied by decided inconveniences to a large proportion of a community using a station, would be treated as an abandonment, while minor changes of location, removals to a short distance only, causing but slight inconvenience to a few persons, and bringing, on the whole, obvious and decided advantages to the community and the railway company, would be treated as relocations.

6. RAILROADS—*Station—Abandonment and Relocation—Jurisdiction of Corporation Commission—Case at Bar.*—In the instant case the distance along the track from the old depot site to the new depot site was 1,475 feet, approximately.

*Held:* That under the state of facts presented in the complaint of citizens of the community to the Corporation Commission against such removal of the station, that tribunal was fully warranted by law in taking cognizance of the situation, the Supreme Court of Appeals refusing to accept the contention of the railroad company that a change of site of a station from one point to another in the same community would be in all cases a relocation and not an abandonment.

7. RAILROADS—*Stations—Abandonment of Station—"Change in the Location of the Line"—Case at Bar.*—In the instant case a new station was erected more than a quarter of a mile south of the old station, upon the other side of the track. At the time of this removal the company was double-tracking its line. The new double-track line was practically on the old right of way. The level of the new track, however, was something like ten feet above the level of the old track.

*Held:* That this double-tracking and elevation of the roadbed upon the old right of way was not such a "change in the location of the line" as was meant by the use of that phrase in clause 48, section 1294d, Code of 1904, providing that a railroad company should not abandon a station without the written consent of the State Corporation Commission, except in cases where stations are abandoned because of a "change in the location of the line."

8. RAILROADS—*Stations—Abandonment of Station—"Change in the Location of the Line"—Case at Bar.*—The words "change in the location of the line," as used in clause 48, section 1294d, Code of 1904, mean an actual abandonment, or giving up, of the old right of way and a transfer of its plant and operations to a new location or right of way.

9. RAILROADS — *Stations — Relocation — Jurisdiction of Corporation Commission.*—Clause 19, section 1105f of the Code of 1904, providing that if any station is abandoned because of a change

23

in the location of the line, another shall be established in lieu thereof at the nearest practicable point thereto, imposes a public duty upon a railroad company which has changed its location and abandoned the stations on the old line. Therefore, the State Corporation Commission is vested with authority to overlook and direct the establishment of the new station under section 1313a, cl. 16, Code of 1904, which invests the Commission with authority to require all corporations doing business in the State to discharge and perform any public duty imposed on them by law.

10. STATIONS—*Abandonment—Jurisdiction of Corporation Commission.*—In case of abandonment of a station by a railroad company not incident to a change of location, the written assent of the Corporation Commission is required, under cl. 48, section 1294d, Code of 1904, and the jurisdiction of the Commission upon the state of facts and its power to give relief are manifest.

11. STATIONS — *Abandonment — "Relocation"—Jurisdiction of State Corporation Commission.*—Although the Virginia statutes do not use the word "relocation" when conferring power and authority upon the Corporation Commission, yet under the sweeping powers conferred the Commission is plainly empowered to intervene in cases of relocation of stations prejudicial to the interests of the public. Under section 156b of the Constitution of 1902, the Commission would have authority, if it deemed an existing station a reasonable and just facility, to require a railroad company to maintain it. And if the Commission should approve the change of the site of a station, it has authority to require the railroad to establish the new station on a site deemed just and reasonable, and, as between two or more sites, to determine the most desirable one.

12. RAILROADS—*Stations—Relocation.*—In the relocation of a station, a railway company is discharging a public duty in which the public is very definitely concerned, and with respect to which it has the right to be heard. The new site must be convenient and accessible. Having in mind the interests of the railroad and the shippers in a given community, the site selected for the relocation station should, on the whole, be reasonably the most convenient, accessible, practicable and desirable one, if a choice has to be made.

13. STATE CORPORATION COMMISSION — *Railroads — Jurisdiction of Commission.*—The obligations imposed upon railway corporations in this State, whether by the Constitution, statutes, or the common law, are obligations imposed by law. The supervision of the discharge of these obligations is committed to the Corporation Commission.

14. STATIONS—*Relocation—Jurisdiction of Corporation Commission.* —A railway company relocating a station in the same community is discharging a public duty which the Corporation Commission has the right to supervise, regulate, and direct.

15. STATIONS—*Relocation—Appeal from Order of Corporation Commission.*—In the instant case an acute conflict was presented in the testimony over the relative suitability, feasibility, and convenience of two locations for a new station rendered necessary by the double-tracking and elevation of the railroad.

   *Held:* That as the Corporation Commission made a personal inspection of the locality and took voluminous testimony, and it could not be said that the conclusion reached by it lacked support in the evidence or that upon the evidence it was plainly wrong, the order of the Commission establishing the station on a site other than the one slected by the railroad must be affirmed.

16. STATIONS—*Relocation—Interests of Community and Railroad.*— When it is necessary to relocate a station, neither the interests of the community nor those of the railroad are to be regarded as paramount.

17. STATE CORPORATION COMMISSION—*Appeals—Weight of Finding of Commission.*—The Constitution provides, with respect to appeals of this character, that "the action of the Commission appealed from shall be regarded as *prima facie* just, reasonable, and correct." Particularly should weight be attached to the findings of the Commission in a case in which, in addition to taking, weighing, and passing on conflicting testimony, that tribunal visits the locality concerned in the effort to reach an appropriate finding on the merits.

18. RAILROADS—*Stations—Railroad Proceeding With New Station After Notice from Commission.*—Upon complaint of a number of citizens of a community alleging that they would be greatly inconvenienced if a railroad removed its station to a proposed new site, the Commission addressed a communication to the railroad asking that steps be taken to prevent anything being done with reference to changing the depot until the Commission had an opportunity to investigate the situation.

   *Held:* That this was plainly a request that the railroad should discontinue operations in connection with the change of location until the situation could be investigated by the Commission, and if the railroad proceeded with operations after this request and incurred additional expense, it did so at its peril.

Appeal from an order of the State Corporation Commission.

*Affirmed.*

The opinion states the case.

*R. B. Tunstall* and *George E. Walker,* for the appellant.

*Jno. R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *R. T. W. Duke, Jr.,* for the Commonwealth.

SAUNDERS, J., delivered the opinion of the court.

This is an appeal by the Southern Railway Company from an order of the State Corporation Commission locating a new station at North Garden, in the county of Albemarle.

The Southern Railway Company (hereinafter to be referred to as the railway company) has maintained a station at the above point for a period much in excess of five years. This station, due to an increasing business, became inadequate to the public needs, but the plans for a new and more commodious depot waited on the progress of the double-tracking operations in which the railway company has been engaged for some years past. When this work began to draw near to North Garden, the problem of a new station at that point became acute. Even without any elevation of the tracks through North Garden, the requirements of a double trackway, and the immediate environment of the old station, forbade the use of that site for the new building.

In carrying out its plan for a double track road, the railway company, as a part of its scheme of track improvement in that locality, elevated its roadbed through North Garden, so as to take out a considerable dip in the old track. This result was effected by means of a fill, but the completed work left the station building something like ten feet below the level of the new track. The old station was on the road leading from Staunton to Scottsville, one of the main

roads of the county. When the grading operations approached North Garden, the railway company dismantled the station and abandoned it. This was inevitable under the new conditions. Apart from all other considerations, the switch requirements of the new double track at that point made the use either of the old building, or of the old site for a new building, impracticable if not impossible. The company located a temporary depot in a box car at a point about 1,500 feet south of the old station.

These operations of the company did not pass unnoticed by the public in that section. A number of the citizens of the North Garden community became greatly aroused over the impending changes and the prospective loss of their old facilities, and addressed a complaint to the State Corporation Commission, alleging that they would be greatly inconvenienced if the North Garden station should be moved to the site proposed by the railway company. Further, they insisted that this site would not only be inconvenient of access to the general public, but positively dangerous.

Upon receipt of this complaint, the commission, through Commissioner Rhea, addressed a communication to the railway company, including therewith the complaint, and asked that steps be taken "to prevent anything from being done with reference to changing the depot at North Garden until the commission had an opportunity to investigate the situation." This letter of Commissioner Rhea to the general superintendent of the company bears date October 10, 1916, and is herewith reproduced:

"Oct. 10th, 1916. sec-r.

"Mr. R. E. Simpson, General Superintendent,

"Southern Railway Company,

"Richmond, Va.

"Dear Sir:

"I beg to hand you herewith copy of a complaint from Mr. S. Maloney, relative to the proposed change in the location of the depot at North Garden.

"I will thank you to take such steps as to prevent anything being done in this matter until the commission has an opportunity for further investigation.

"Kindly acknowledge receipt.

"Yours truly,

"(Signed)   WM. F. RHEA,

"Commissioner."

This letter was received and acknowledged by Superintendent Simpson on October 10, and the commission was informed that the complaint had been transmitted to the chief engineer of construction of the company. Not hearing from the chief engineer or any other official of the company, Commissioner Rhea addressed the following letter to Superintendent Simpson on October 17, 1916:

"Dear Sir:

"I am in receipt of your letter of the 10th instant relative to proposed change in the location of the depot at North Garden.

"I will thank you to ascertain for the commission what changes the construction department proposed to make in the station facilities at this place.

"Yours truly,

"(Signed)   WM. F. RHEA,

"Commissioner."

No answer was received to this letter until November 19, 1916, over a month later, on which date Superintendent Simpson wrote to Commissioner Rhea, enclosing a letter to him from Vice-President Spencer of the Southern Railway Company. This letter to Simpson stated that the "double tracking operations of the Southern made it impossible to continue to use the old station, or to enlarge it." The letter also gave a brief account of the activities of the Southern in seeking a new location for a station at North Garden, and announced that the station had finally been located at "the only feasible and practical place, and the grading there-

for had been completed." The location referred to in this letter is what is known in the record as the "Pleasants site," and is to the east of the tracks of the railway and south of the old station. Thus apprised for the first time that the company had located a new station, although over five weeks prior to the letter of November 19, Commissioner Rhea had called the attention of the company to the objections raised by various citizens of the North Garden community to the proposed change of location, and asked that such steps be taken "as to prevent anything being done in the matter until the commission had an opportunity for further investigation," the chairman of the Corporation Commission on December 14, notified the general superintendent of the company that unless the station at North Garden was restored forthwith, it would be necessary for the commission to summon his company to "show cause why it should not be fined," etc. Apparently no action was taken by the company on this communication looking to the restoration of the station, and on December 30, 1916, the commission issued a rule against the company, returnable to January 12, 1917, to show cause why it should not be ordered to reestablish the station at North Garden upon the old site, or at some point on its road more convenient to the public than the proposed new site. An order was made a few days later requiring the company to show cause why it should not be ordered to establish and maintain under its elevated track at North Garden such an underpass as might be reasonable and just.

The proceedings in the two cases were consolidated and much evidence was taken with reference to the underpass and the location of a new station. The underpass case has been disposed of, first by an order of the commission, and later, on appeal, by an order of this court in the case of *Southern Ry. Co.* v. *Commonwealth, et al,* 124 Va. 36, 97 S. E. 343. The forty-five degree underpass directed by

these orders to be established is at the intersection of the old Scottsville road and the railroad at North Garden.

In the instant case, the commission ordered the railway company to "acquire a suitable depot lot from Mrs. Sally M. Jones, on the west side of the railroad, and erect thereon an adequate depot and facilities for the service of the public at North Garden." The pending appeal was taken from this order.

Before passing on the questions of fact involved in the conflicting claims of the merits of the Jones and Pleasants sites, there are some preliminary questions of law that require disposition.

The petition of the appellant insists that the present case is "not controlled by any provision of statute law in Virginia, and that the station at North Garden has never been abandoned." The contention is made that the mere change of site of a station from one point to another in the same community does not, under the authorities cited by the appellant, constitute the abandonment of the station.

[1-4] The word "abandon" means, to give up, to cease to use. Of course in this, the ordinary sense, the old station at North Garden has been abandoned. Every relocation of a station, whether in the same community or not, strictly speaking, is a change of location or site, and therefore an abandonment of the old site, but there may be changes of location so slightly to the prejudice of any portion of the community and on the whole so beneficial to the majority of the public having business at the station, that they will not be regarded as abandonments, but as relocations in the sense insisted upon by the appellant. Particularly would this be true where the changes made are minor changes, and the station, if the old site is entirely abandoned, is removed but a negligible distance. Such changes, we presume, would be allowed by the law, measurably upon the principle of *de minimis lex non curat*. But obviously there may be changes

in the same community of so serious a nature, involving the rights of the public to so considerable a degree, and affecting them so prejudicially, that they must be regarded as abandonments, and not permitted as relocations and as such remitted solely to the discretion of the railway companies.

It is said in *Attorney General* v. *Eastern R. R. Co.,* 137 Mass. 45, that "no general rule of law applicable to all cases can be laid down, as to what change of station will constitute an abandonment or a relocation." The decision in each case must rest upon the facts of that case, and if there is an authority created by law to deal with cases of abandonment, that authority cannot be ousted of jurisdiction to make investigation by the suggestion that the case is a relocation and not an abandonment. This investigation may affect the "ultimate order, but not the jurisdiction of the properly constituted authority."

[5] Among the determining factors of an inquiry whether a given removal is an abandonment or a relocation will be the distance to which the station is removed, the number of patrons prejudicially affected by the removal, and the extent of their injury or damage. Removal to a considerable distance, accompanied by decided inconveniences to a large proportion of a community using a station, would be treated as an abandonment, while minor changes of location, removals to a short distance only, causing but slight inconvenience to a few persons, and bringing, on the whole, obvious and decided advantages to the community and the railway company would be treated as relocations, in the meaning of the authorities cited. In the case from Massachusetts, cited *supra,* in which it appears that railroad companies in that State may make minor changes in the location of stations, upon securing the sanction of the board of railroad commissioners and the selectmen, the court did not accept the finding of the board as final evidence in the case

that the change under consideration was a relocation and not an abandonment. The court went into the evidence, stating that "upon the facts of the case before us, they (*i. e.*, the railroad commissioners) were clearly justified in treating the change of station as a relocation, within the statute." In the same connection, the court significantly said: "We need not decide whether a case might not arise in which this court would revise the proceedings of these boards, and hold that a change made by their permission as a relocation was in fact an abandonment of the station."

[6] We cannot accept the contention of the appellant that a change of site of a station from one point to another in the *same community* will be, in all cases, a relocation. A community is often an indeterminate area, difficult if not impossible of exact delimitation. The area referred to in the record as the North Garden community probably extends for several miles along the railroad, north and south of the old station. To dismantle the station and remove it, say to a point two miles north or south of the old site, but within the limits of the North Garden community, to the very great inconvenience and prejudice of the patrons of the old depot, would certainly be regarded as an abandonment of the North Garden station. The illustration can be varied from the extreme cases of change in a community that are plainly abandonments to others not so easy of ascertainment, until we reach those cases involving minor changes and little inconveniences, which with equal propriety may be pronounced relocations. In the instant case, according to the testimony and measurements of the witness, R. H. Harrison, highway commissioner of Albemarle county, "the distance along the track from the old depot site to the new depot site (*i. e.*, the Pleasants site) is 1,475 feet, approximately." Accepting these figures, a depot on this site will be between a quarter and a third of a mile south of the old site. Such a dislocation of the old facilities

will naturally involve considerable readjustments in the business life of the North Garden community.

Upon the state of facts presented in the complaint of the citizens of North Garden to the Commission, that tribunal was fully warranted by law in taking cognizance of the situation. The power and authority of the Corporation Commission in this State is derived from our Constitution and statutes. The obligations imposed upon the railroad companies, whether by the Constitution and statutes, or by the common law, are all obligations imposed by law. The Corporation Commission was established by the Constitution to visit, supervise, regulate and control these corporations and other corporations doing business in the State, and to that end has been equipped with the necessary authority. In the underpass case, referred to *supra*, the following statement is made with reference to the jurisdiction of the Corporation Commission: "It is charged with the duty of enquiring and ascertaining whether or not the law has been violated, and, if a public duty has been neglected, of enforcing its performance." *Southern Ry. Co. v. Commonwealth, supra.*

[7, 8] From the same case, we cite as follows: "Section 156a of the Constitution designates the Corporation Commission as the department of the government for the visitation, supervision, regulation and control of corporations. Section 156b clothes the commission with the power, and charges it with the duty to supervise and regulate the transportation companies in all matters relating to the performance of their duties. Section 1313a, clause 16, of the Code invests the Corporation Commission with power and authority to require all corporations doing business in the State to discharge and perform any public duty imposed by law upon such corporations. Section 1294b, clause 19, of the Code declares that any person aggrieved by the omission of a

public service corporation to discharge its duty shall have the right to complain thereof to the Corporation Commission, and if the complaint is established, the commission is authorized to grant relief. Other sections of the Code, for example section 1313a, clauses 20 and 21, manifest an intention on the part of the legislature to give to the commission supervision and control over the operation of transportation companies." The appellant contends that even if its action was an abandonment of the station, such abandonment was incident to a change of location of its line, and under the proviso to clause 48 of section 1294d of the Code such an abandonment is excepted from the operation of the general law. That section is as follows:

"Any railroad company that has established and maintained throughout the year, for five consecutive years, a passenger station at a point on its road, shall not abandon such station without the written consent of the State Corporaion Commission, * * * provided that so much of this section as relates to the abandonment of stations shall not apply in cases where stations have been abandoned because of a change in the location of the line of any such railroad."

This contention of the company renders necessary an inquiry into the meaning of the words, "change in the location of the line," occurring in the section cited.

The present line of the Southern Railway Company through North Garden is practically on the old right of way. This will appear from the following answers of Vice-President Spencer to questions propounded to him by the members of the commission:

"Q. (By the chairman of the commission) I want to get the particular question as to whether your alignment has been changed at North Garden, so that you are out of your old right of way, or whether you are simply on the same old right of way.

"A. We are on the same old right of way, and then some more, spread out more.

"Q. (By Commissioner Wingfield.) You are still on the same right of way practically?

"A. Yes, sir."

From these answers it sufficiently appears that the old road bed has not been abandoned, but is still in use, and that the present right of way through North Garden while a little wider is practically the same as the old one. Additional land on one or both sides of the old right of way was evidently acquired to provide for the deeper cuts and broader and higher fills required for a double track road, but the line of the railroad through North Garden is practically the old line, save that the level of the new tracks is something like ten feet above the level of the old track.

Appellant regards this elevation of level, this piling of dirt on the old substratum, as a change of location. In this view any elevation or depression of the track to a measurable extent would be a change of location, since such change of level would change the location, or position, of the ties and rails. But would this be a "change of the location of the line," in the contemplation of the statute? The statute evidently means by these words an actual abandonment, or giving up, of the old right of way and a transfer of its plant and operations to a new location or right of way. A station is a necessary adjunct of a "going" railroad. If a railroad ceases to go by a given station, the utility of the old building for station purposes instantly ceases. Hence, when the law gives a railway company the right to acquire another right of way for its operations, and such right of way is acquired pursuant to law, the abandonment by law of the old right of way necessarily carries with it the abandonment by law of the stations on the old line, subject to certain limitations fixed by the statute. The true meaning of the words "change in the location of the line of any such

railroad," will be apparent upon an inspection of clause 19 of section 1105f of the Code, which is herewith reproduced:

"Notwithstanding any such company may have made a location of lands for its purposes, and proceeded to ascertain the compensation therefor, or may have completed its works thereon, and operated the same, such company may afterwards change its location, from time to time, as often as it may see cause; and proceedings may be had to ascertain what will be a just compensation for the lands, or for the interest or estate proposed to be taken in the land, and the damages to the adjacent and other property of the owner, or to the property of other persons, upon any such new location, and the work may be constructed upon or through the same, and the title to such lands, or to such interest or estate therein, obtained in like manner as if it were the first location. But whenever a change of location authorized by this section shall be made, the title to lands, or to the interest or estate therein, condemned for the former location shall revert to the original owner, his heirs or assigns. And full power and authority is hereby given any railroad company chartered by the State of Virginia to change the location of any part of the line of its railroad between its existing termini, in order to straighten or improve the same, whenever such change may be considered desirable by its board of directors, so as to shorten the distance between its terminal or between its main line and the terminus of any branch, or as to improve the grades or alignment on said main line or branch; but in making such change or improvement no road shall be permitted to abandon its own tracks or road-bed, and adopt and use the tracks or road-bed of any other railroad in lieu of its own; and proceedings may be had to ascertain what will be a just compensation for the lands, or for the interest or estate therein, required for such new location, and the damages to the adjacent and other property of the owner, or the

property of other persons, in the manner provided in this act, and the work may be constructed upon or through the same, and the titles to such lands, or to such interest or estate therein, obtained in like manner as if it were the first location: provided, however, that such new line shall be located at no greater distance than one mile from any station already established on said railroad, and at no greater distance than two miles from any point on the then existing line of said road; and provided, further, that if any station shall be abandoned in consequence of such change, that then, and in that event, another station shall be established in lieu thereof at the nearest practicable point thereto: and provided, further, that in so changing the location of its lines no company shall remove its lines from nor abandon a county which subscribed money to the building of such lines through such county: and provided, further, that no such change of route which would amount to an abandonment of a station at any town or village having a population of one hundred inhabitants or over, or having a courthouse or county seat, shall be made; and provided, further, that whenever any station shall be so abandoned at which there shall be located any manufacturing establishment or establishments of the assessed value of five thousand dollars or over, the owners of such establishments shall be paid such damages as they may sustain by reason of said change of location, not exceeding the assessed value thereof, such damages to be ascertained by the commissioners appointed in the manner in this act provided, for the condemnation of lands, or an interest or estate therein, for that purpose by the court of the county in which said station is located."

The changes of location authorized by this section are plainly removals of a road from one right of way to another, and not elevations or depressions of the level of the tracks, and it is to changes of this character that the words "change

of location of the line of any railroad" refer. Hence, if the change of station at North Garden was an abandonment, the railway company could not rely upon the contents of the proviso in the instant case, since there was no change in the location of its line at North Garden. The contention of the company in this respect is not well taken.

[9, 10] But even if it be conceded that the Commission had no authority to forbid the abandonment of the old station, on the ground that the discontinuance of the old station was an abandonment incident to a change of location of the line at North Garden, then in that view the commission was unquestionably vested with ample authority to overlook and direct the establishment of the new station. The section last cited provides that if "any station shall be abandoned in consequence of such change (*i. e.*, of location), then and in that event another shall be established in lieu thereof at the nearest practicable point thereto." This provision imposes a public duty upon a railway company which has changed its location and abandoned the stations on the old line. That duty is to provide other stations at the nearest practicable points to the old stations. Section 1313a. clause 16, Code of Virginia, specifically invests the commission with authority to require all corporations doing business in the State, to discharge and perform any public duty imposed on them by law. Further, if this is a case of abandonment not incident to a change of location, the assent of the commission was required, and the jurisdiction of the commission upon such a state of facts and its power to give relief are manifest.

Our conclusions summarized are:

First: If the action of the railroad at North Garden was an abandonment of the station, incident to a change in the location of the line, the commission could not forbid the abandonment, but had jurisdiction over the establishment of the new station.

Second: If such action was an abandonment not connected with a change of location of the line, the written assent of the commission was required to make the abandonment lawful.

In either view the situation would be one within the jurisdiction of the commission to investigate and afford relief.

[11] Appellant seems to think that the statutes of Virginia are silent on the subject of the relocation of a station, and that so far as these statutes and the Constitution are concerned the case under consideration is a *casus omissus*. With this contention we cannot agree. Our statutes do not use the word "relocation" when they confer power and authority upon the Corporation Commission, but under the sweeping powers conferred, the commission is plainly empowered to intervene in cases of relocation prejudicial to the interests of the public. A relocation prejudicial to the public is not an adequate discharge of a public duty by the railway corporation, and a breach of duty is a violation of law. The commission is charged with the duty of making inquiry and investigation "for the purpose of ascertaining whether anything has been done or omitted in violation or contravention of the law."

Section 156b of the Constitution provides that "the commission shall have the power, and be charged with the duty, of supervising, regulating and controlling all transportation and transmission companies doing business in the State, in all matters relating to the performance of their public duties, and so forth, and to that end the commission shall require them to establish and maintain all such public service facilities and conveniences as may be reasonable and just." Under this section, the commission would have authority, if it deemed an existing station a reasonable and just facility, to require a railway corporation to maintain it. *A fortiori*, if the corporation should abolish a facility deemed necessary and just, would the commission have the

authority, if it approved a change of site, to require the corporation to establish the dismantled station on a site deemed just and reasonable; and, as between two or more sites, to determine the most desirable one.

[12-14] In the relocation of a station, a railway company is discharging a public duty in which the public is very definitely concerned, and with respect to which it has the right to be heard. The new site must be convenient and accessible. Having in mind the interests of the railroad and the shippers in a given community, the site selected for the relocated station should, on the whole, be reasonably the most convenient, accessible, practicable and desirable one, if a choice has to be made. This court has said heretofore that a railway company is required, under all circumstances, to do what may be reasonably necessary and suitable for the accommodation of passengers and shippers. *Danville & Western R. R. Co.* v. *Lybrook*, 111 Va. 623, 69 S. E. 1066, Ann. Cas. 1912 D, 175. The obligations imposed upon railway corporations in this State, whether by the Constitution, statutes, or the common law, are obligations imposed by law. The supervision of the discharge of these obligations is committed to the Corporation Commission. A railway company is charged with the duty to provide the public with reasonable depot facilities. The public and the railway company are alike concerned that, in the relocation of a station, the site selected shall not be inconvenient.

In the opinion of this court, a railway company relocating a station in the same community is discharging a public duty which the Corporation Commission has the right to supervise, regulate and direct. Hence, in assuming jurisdiction with respect to the relocation of the station at North Garden, the commission was acting by authority of law.

Having disposed of the questions of jurisdiction and authority, the remaining inquiry relates to the location of the station at North Garden.

The site approved by the commission is the "Jones" site, and is on the west side of the railroad tracks at no great distance south of the old station. The site selected by the railroad authorities, like the Jones site, is south of the old station, but east of the tracks. With the acquiescence of all parties concerned, the commission appointed three engineers, Mr. Blidden, an engineer of the Highway Commission of this State, Mr. Harrison, a Federal official, and Mr. Marye, the engineer of the commission, to visit the locality of North Garden and make a report as to the underpass and the proposed depot sites, pursuant to written instructions to be given by the commission. The following figures and other material are taken from this report:

1st. "First as to the location known as the Jones lot on the west side of the railroad, which is shown upon the accompanying blue print, marked 'Exhibit No. 4,' between letters A, B, C and D, with the depot location upon the west side of the main track about 100 feet south of the old depot.

"We estimate the cost of the layout upon this site to be as follows, exclusive of the building and platform, which will be the same upon any site selected."

(The cost of the land to be acquired for this site, of the excavations needed, of the side track and of work on the necessary depot road, was placed by the engineers at $18,286.)

"We enclose blue print showing the location of depot layout upon the Pleasants lot, together with the new road connecting same with the county road. * * *

* * * * * * *

"Estimated cost of the layout on Pleasants site as follows:

* * * * * * * *

"Total cost ................................$9,300

"In addition to the above should be added the cost of an approach to the depot upon the Pleasants site along the west side of the tracks from the county road, opposite

Smith's store, and crossing by overhead bridge to the east side about 400 feet north of the depot, as suggested by Mr. Spencer, if found necessary.

\*   \*   \*   \*   \*   \*   \*   \*

"Total cost ...................................$5,970

"A plan of this proposed road is shown upon the blue print, No. 6. In order to reach the depot upon the Pleasants site, shippers upon the east side will have to travel 500 feet less distance than to the old depot, whereas shippers from the west side will have to travel 2,100 feet further by the way of the underpass and county road, or 1,300 feet more by the west side overhead bridge route."

The road to be built if the depot is placed on the Jones site will be a very short one, but should the Pleasants site be approved, two roads, or approaches, will be necessary to afford the public reasonable and adequate facilities. Both of these roads are referred to in the engineers' report. The one on the east side of the track will begin at a point on the Scottsville road about 1,500 feet east of the old depot. From this starting point to the depot on the Pleasants site will be approximately 900 feet. The present grade on this approach from the Scottsville road varies, according to the engineer, Harrison, "from ten and one-half per cent. for the first 100 feet, from the intersection, and gradually becomes less as the road reaches the new depot." It is considered, however, that by doing considerable work, it will be practicable to establish a reasonable grade, with a maximum of six per cent. on the steepest portion of this road.

The distance of the proposed depot on the Pleasants site from the old station along the railroad will be, according to the reply brief of the appellant, about 1,475 feet. The road by which it is proposed to provide access to the Pleasants site for the people on the west side of the railroad tracks, would begin on the Scottsville road west of

the underpass, thence south and in a general way parallel with the tracks of the railroad for about 1,260 feet, thence turning to the east and crossing the railroad by an overhead bridge, down grade to the station, the last distance being approximately five or six hundred feet. This road, according to the testimony of Mr. Abernathy, engineer for the Southern Railway Company, "will have a six per cent. grade." The land necessary to be acquired for the construction of this road would, in all likelihood, be difficult of acquisition and expensive, since as projected it would run through several houses. In response to a question concerning this road, Vice-President Spencer made the following reply: "The Southern Railway, if the county will furnish the right of way, will undertake to grade and construct the road, and build the overhead bridge."

Upon a comparison of the Jones and Pleasants sites, with respect to the relative distances to be traveled by persons coming from the east and west sides of the railroad at North Garden, it will be noted that shippers from the west side in order to reach the Pleasants site will go under the railroad by the underpass, thence on the Scottsville road 1,350 feet, thence by new road, say 900 feet, to the station, the whole distance being over 2,200 feet, or 2,100 feet more than was required to reach the old station. Should the road by way of the proposed overhead bridge be constructed, these same shippers could reach the depot on the Pleasants site by traveling something like 1,700 or 1,800 feet, or 1,300 feet more than was necessary to reach the old depot. Shippers from the east side going to the Pleasants site will travel "five hundred feet less distance than to the old site." Shippers from the west side would reach a depot on the Jones site by traveling about one hundred feet further than they traveled to reach the old station. Persons on the east side of the North Garden station and also east of the road from the Scottsville pike to the Pleas-

ants site would travel about 950 feet further to reach a depot on the Jones site than one on the Pleasants site. According to the testimony of the engineer, Marye, there would be no difficulty in securing a reasonable grade on the road from the Scottsville pike to the Jones location. The evidence shows that the bulk of the North Garden passengers come from the east side of the road, but ninety per cent. of the freight shipments come from the west side. Under modern conditions, it is likely that a large proportion of the passenger traffic comes to North Garden in automobiles. To people so traveling, the extra mileage to be traveled to reach a station on the Jones site would be negligible; but to shippers hauling bulky articles, like apples, poles, and other heavy freights, the extra travel needed to be made to reach a depot on the Pleasants site, as compared with one on the Jones site, would be an appreciable burden.

The total acreage of the Jones site is 2.04 acres; that of the Pleasants lot is somewhat larger, but not all of it is available for depot purposes. The Jones site will be prepared by excavating and filling, resulting in an area without precipitous sides. The Pleasants site was largely prepared by filling, the total yardage in this filling being 37,500 yards. The depot area thus created has at places very high and precipitous sides, to which considerable objection is made by citizens on the score of danger in the ordinary use of the station. On the part of the railroad it is proposed to protect these fills with a fence. A considerable part of the heavy freight coming to North Garden is logs and long poles. Provision is made on both sites for this class of freight, but having in mind what has been stated with respect to the approaches to the two sites, the short and easy access to the Jones site from the Scottsville road will render that cite very much more convenient to shippers of freight of this character, and for that matter, of all heavy freight, than the Pleasants site.

On the part of the railroad, it is insisted that the traffic at North Garden (what is styled the acute traffic), in apples, wood, lumber and poles, is largely northbound, and for that reason it is described that "the station facilities should be such that the northbound trains can pick it up without having to cross over the southbound track." Hence, the conclusion of the company that the station should be on the east side of the right-hand, or northbound track. There is merit in this contention, though it is challenged in the testimony of those who favor the Jones site.

A further contention on the part of the railway company is, that present and likely developments in the territory on the east side of North Garden justify the expectation of a large increase of freight from that community. It is true that a considerable orchard has been planted on the east side of the railroad, and reasonably speaking, other orchards may follow, but the weight of the testimony shows that there is possibly three or four times as much farming land on the west side of the track tributary to North Garden as on the east side. In this acreage there are many bearing orchards and young orchards yet to come into bearing. It is altogether likely that the development of the area on the west side of the track will keep pace with development on the east side, thus maintaining the present relative proportion in the freights coming from the areas east and west of North Garden.

[15, 16] It is evident from what has been said that an acute conflict is presented in the testimony over the relative suitability, feasibility and convenience of the two locations under consideration. The interests of both the railroad and the community are to be considered in the choice of a site, and when these interests conflict the difficulty of selection is greatly increased. At one time the railroad had under consideration the adoption of the Jones lot, and we think it may be fairly inferred from the evidence that the

determining factor in the rejection of that lot by the company was the cost of the land necessary to be acquired for a depot site. From the standpoint of the community's interests, the weight of the testimony (and the witnesses include many men of affairs in that locality) decidedly favors the location of the depot on the Jones site. This location is much nearer to the old location than the Pleasants lot, and is much more convenient of access to the shippers on the west side than the Pleasants lot, even should the road proposed by way of the overhead bridge be constructed. The removal of the old depot to any new site will involve loss to property owners surrounding the old location, but from the proximity of the Jones lot to the old location, it is believed that the loss to these property holders resulting from a change of depot site, will be less in the case of the Jones, than of the Pleasants location. In the matter of original cost, if the railroad is required to construct a road to the Pleasants lot by way of the overhead bridge, and to improve the approach on the east side of the railroad and the Pleasants lot itself, the difference in cost between the two sites would be only a few thousand dollars—not enough to be seriously balanced against the advantages to the community, as a whole, of a depot on the Jones lot; and while the suggestion of the railway company with respect to the advantages of a site on the other side of the track for moving northbound traffic, and for other reasons appealing to the company, are by no means to be overlooked, yet they are not controlling, but must be set against the local interests of the community and a conclusion reached upon the whole. The interests of neither party to this controversy are to be regarded as paramount.

The commission made a personal inspection of the locality and took voluminous testimony. Certainly it cannot be said that the conclusion reached lacks support in the evidence, or that upon the evidence it is plainly wrong.

[17, 18] The Constitution provides, with respect to appeals of this character, that "the action of the commission appealed from shall be regarded as *prima facie* just, reasonable and correct." Particularly should weight be attached to the findings of the commission in a case in which, in addition to taking, weighing and passing on conflicting testimony, that tribunal visits the locality concerned in the effort to reach an appropriate finding on the merits. The evidence in this case shows that work had been done and money expended on the Pleasants lot before the receipt of the latter from Commissioner Rhea. It is not clear to what extent work proceeded thereafter. But to whatever extent it did proceed, it was at the peril of the company. Commissioner Rhea's letter was a request to the company to take whatever steps might be necessary to prevent anything from being done in the matter of the location of a station at North Garden until the commission had an opportunity for further investigation. This request should have been instantly regarded. The right of the commission to make this investigation is unquestionably afforded by the laws of this Commonwealth, and no corporation made subject by those laws to the jurisdiction and authority of the commission should undertake to set its authority at naught, or in advance of an investigation in contemplation by the commission, and of which the company is duly advised, proceed with work that may be affected by the results of that investigation. The letter of October 10, 1916, of Commissioner Rhea to Superintendent Simpson was answered by Simpson on November 19th, enclosing a letter from Vice-President Spencer, bearing date October 16th, to the effect that the depot had been located at the only feasible and practicable place, and the grading completed. The letter of Commissioner Rhea was plainly a request upon the company to discontinue operations of every character in connection with the change of location until the whole situa-

tion could be investigated by the commission. If anything further was done, if any additional expense was incurred in connection with the Pleasants lot, as a site for a new station at North Garden, after the receipt of the commissioner's letter, such steps were, as stated *supra,* at the peril of the company.

After a careful review of the evidence in this case, and in view of the principles announced, it is not considered that the objections urged by the appellant to the order complained of are well taken, and that order is affirmed, and this cause is remanded to the Corporation Commission to the end that it may afford a reasonable extension of the time limits of the requirements of the third paragraph of its order providing when the work required to be done by the railway company shall be completed and the station building and tracks ready for public use, and for such further orders as may be necessary.

*Affirmed.*