# Richmond.

## NORFOLK AND WESTERN RAILWAY COMPANY V. H. B. FARIS.

March 19, 1931.

Present, Prentis, C. J., and Campbell, Holt, Epes and Browning, JJ.

The opinion states the case.

*W. Moncure Gravatt,* *B. W. Leigh* and *John Martin,* for the plaintiff in error.

*George E. Allen* and *Thos. W. Ozlin,* for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action of trespass on the case brought by H. B. Faris in the Circuit Court of Halifax county against the Norfolk and Western Railway Company to recover $10.000.00 damages for personal injuries received when an automobile driven by him turned over on the north approach to a crossing at grade of the railway company's tracks over a county road. The case was submitted to a jury which returned a verdict for $3,500.00 against the railway company, upon which the court entered judgment, from which judgment a writ of error has been granted the railway company.

The single track line of the Lynchburg and Durham division of the Norfolk and Western Railway Company crosses the county road running from Nathalie to Lennig in Halifax county at grade at what is known as Henderson's crossing, where Faris was injured.

Both the railroad and the county road here run east and west. Faris was traveling east, and the accident happened on the north approach to the crossing.

The general course of the railroad is straight for some distance on both sides of this crossing, and the road on each side of the crossing runs approximately parallel with the railroad. As one approaches from the west, the road lies south of the crossing, and a short distance from the crossing curves about 30° to the left (north) to make the crossing. At from 20 to 25 feet south of the crossing it straightens out, crosses the crossing at an angle of about 30°, and continues approximately straight for about 20 to 25 feet north of the crossing. Here it begins to curve to the right (south) and curves approximately 30° until it is on a line nearly parallel with the track. As is shown by the photographs introduced in evidence, on the north side of the track the point of the curve is about where a culvert crosses the road, which culvert the map introduced by the plaintiff shows is approximately 100 feet east of the center of the crossing.

The railroad was built in 1889. In constructing its works the railway company moved the county road for some 150 to 200 yards west of this crossing to the south of its then location, but left the road practically unchanged to the east of the crossing.

This road was then a single track, unimproved public road, the traveled way along which all the witnesses agree was about 12 feet wide. It had been used as a public road for many years prior to 1889, but there is no evidence as to when or how it was established as a public road. As early as 1889, at places along the road, ditches had been plowed out, the dis-

tance between the furrows being about 20 feet; but just at the crossing there were no ditches.

The testimony with reference to the working of this road prior to its improvement in 1926 is meager.

R. H. Gregory, a witness for the plaintiff who testifies he has lived in the vicinity of this crossing for fifty-five years, in explaining why he was so familiar with the road, says: "I wouldn't know so much about that road, but years back, people were summoned about two or three days in a year to work the road, and they had to do it or pay a fine, and I happened to have to work that road a good many times."

W. E. Hazelwood, a witness for the defendant, sixty-four years of age, who was living about a mile and a half from this crossing when the railroad was constructed, testifies as follows:

"Q. How wide do you suppose it (the road) was?

"A. Not over 20 feet.

"Q. Was the road actually in use a 20-foot road?

"A. No, sir; but they had some little furrows plowed out along there, but the road that was used was very narrow, just one track.

"Q. You say this road was originally, that is, at the time the railroad was built across it, about 20 feet wide?

"A. No, I don't think it was, the ditches were about 20 feet apart, but the road itself was not.

"Q. What portion of the road was worked by the road authorities, what was the distance from ditch to ditch where the road was worked?

"A. I would say it was about 20 feet.

"Q. Were there any ditches about that crossing?

"A. No, sir; not at the crossing. They would have a little furrow plowed on each side of the road, but at that particular place it was always in pretty good shape and did not need any ditches.

"Q. How wide did they work the road at that point?

"A. I couldn't say to save my life. When I first knew

the road in those days it was worked very little at any point, they would just scrape a little dirt and then went to plowing and went back home.

"Q. Mr. Hazelwood, in answering the questions I am going to ask you, please confine yourself to conditions before the railroad was built. * * * Where the crossing now exists and for a hundred or two or three hundred feet on each side * * *, what was the width of the worked part of that public highway or what had the county appropriated as a public highway and worked?

"A. I couldn't say exactly to save my life. They had little ditches or furrows plowed out on either side about 20 feet apart."

In statements made in the presence of the jury counsel for the plaintiff contended that this road was a regularly established county road 30 feet wide, while, also in the presence of the jury, counsel for the defendant made the contention that the evidence showed that this was a public road only by prescription and limited in width to the actually traveled way, that is, that the right of way was only 12 feet wide.

The evidence is silent as to whether the county at any subsequent time acquired any greater width for the right of way of this road than it had in 1889.

The track at this crossing is approximately 6 feet above the level of the surrounding land; and when the railroad was built embankments were constructed on both sides of the crossing to carry the road over the track. These embankments were shorter and narrower than those in existence at the time Faris was injured; but the crossing and the approaches thereto were constructed as wide as the then traveled way, about 12 feet wide.

At the time the railroad was built the statute law relating to the construction of crossings at grade of a railroad over a county road was contained in sections 1094, 1095, Code Va.

1887, which are quoted in the footnote;[1] and the evidence shows that the requirements of these sections were substantially complied with in the construction of this crossing.

This road and crossing remained in practically the same condition in which they were immediately after the railroad was built until in 1926, when the road was improved, widened and top-soiled by the county of Halifax.

In 1926 the county of Halifax, with a road force working under the supervision of Mr. Micou, its county engineer in charge of the construction and maintenance of the county roads, improved this road and surfaced it with top soil. Mr. Micou testifies the road as improved was built as a 22-foot road (apparently he means 22 feet in width including shoulders and the ditches). The embankment on each side of the crossing was lengthened to reduce the grade on the approach, and made wider than it had been before; and the height of the embankment was increased where necessary to make it conform to the grade of the lengthened approach. All the work of widening, lengthening, and increasing the height of the embankments for the approaches, up to the track itself, and of top-soiling the roadway thereon was done by the county of Halifax and paid for by the county; and no part thereof charged was to the railway company. The only thing done by the railroad was to widen the crossing over the track itself

---

[1]Section 1094, Code 1887—"If any railroad * * * company deem it necessary in the construction of its works to cross any other railroad, * * * or county road, it may do so; provided such crossing does not impair the safety, or impede or endanger the operations of the road, * * * which is crossed, and provided such crossing be supported by such permanent and proper structures and fixtures as will best secure the safe passage and transportation of persons and property along such crossing and will not be injurious to the works of the company to be crossed. * * * But any county road and steam or watercourse may be altered by any such company, for the purpose aforesaid, whenever it shall have made an equally convenient road or waterway in lieu thereof."

Section 1095, Code 1887—"Every railroad hereafter constructed across a county road * * * shall, as far as practicable, pass at surface grade, or pass beneath or above any existing structure, at a sufficient depression or elevation, as the case may be, with easy grades, so as to admit of safe and speedy travel over each."

to the width of the roadway constructed up to the track by the county. At its highest point the embankment is 6 feet high.

The testimony shows that the approaches to the crossing and the roadway thereon were at the time of the accident and at the time of the trial, of the same width that they were constructed by the county of Halifax in 1926; and there is no suggestion in the evidence that the railway company has failed to maintain the roadway on these approaches in a smooth and level condition to the full width of the approaches as constructed by the county. The complaint made is that the tops of the approaches and the roadway thereon were not constructed of greater width and barriers, or guard rails, erected thereon.

Plaintiff's witness, E. R. Farmer, the county surveyor of Halifax county, a few days before the trial made measurements on the ground and compiled a map of this road for about 100 feet on both sides of the crossing. According to this map and the testimony of this witness, the width of the road where the north embankment begins: "About 100 feet" east of the crossing, was "about 20 feet;" opposite a telephone pole, 47 feet east of the center of the crossing, the road was 17 feet wide; where Faris' automobile went over the embankment (40 feet from the center of the crossing), the width of the road was practically the same as opposite the telephone pole, and the height of the fill was 4½ feet; at the point where the left front wheel of Faris' automobile first ran into the soft earth at the left edge of the embankment (about 6 feet from the track) the width of the road was 14 feet, and the height of the embankment 6 feet; and in the center of the crossing the width of the road was 13 feet.

However, the witness does not accurately define what he means when he says that the road about 100 feet east of the crossing was "about 20 feet." When asked by plaintiff's counsel if he meant "the traveled portion of the highway," he says: "Yes." But on his map, which is drawn to the scale of 10

feet to the inch, a culvert is shown at a distance of about 100 feet from the track, and the width between the inner surfaces of the bulkheads of this culvert is 20 feet, or perhaps a little less; and the photograph showing the road at this point and east thereof throws much doubt upon whether the whole of the 20-foot width at, and east of, this culvert can be properly said to be included within that portion of the roadbed which by its construction is designed and intended to be ordinarily used by persons traveling the road. Likewise, taking the county engineer's testimony that he constructed this road as a 22-foot road between the ditches, the photographs showing the road to the west of the center of the crossing seem to show that the portion of the roadbed which by its construction was designed and intended to be ordinarily used was not as much as 20 feet wide.

This road is a cross-road between the State highway leading to Richmond and the State highway leading to Lynchburg. On one day when there was a gathering of some kind at Catawba Church, which is about one and a half miles from this crossing, one of the plaintiff's witnesses counted 169 cars passing a point near this crossing between about 9 A. M. and dark, each passage of a car being counted as a separate car. This, however, appears to represent approximately a maximum for density of travel on this road at this crossing.

About dark in the evening of August 10, 1927, H. B. Faris, accompanied by his brother, was traveling east along this road in an automobile driven by H. B. Faris.

According to his testimony, he drove on and over the crossing at from eighteen to twenty miles an hour and was traveling practically in the center of the road. When the left front wheel reached a point just inside the north rail, a loose railroad spike stuck into the tire of this wheel and caused it to deflate suddenly. The automobile swerved sharply to the left, and ran over onto the soft earth on the left edge of the embankment at a point about 6 or 8 feet from where the tire

picked up the spike. Then he says: "I was in a life and death struggle with the steering wheel when I saw the embankment and saw where the car was going, and I held it on the crown of the knoll as much as I could, and finally after going 20 to 30 feet it started to buck a little bit and when it did it flopped over."

The automobile ran off the embankment about 40 feet from the north rail of the track, where the embankment is 4½ feet high, which point is on the railway comany's right of way, turned over to the left, and injured H. B. Faris. His brother opened the door on the right-hand side of the car and jumped out before the car went off the embankment.

Faris admits that he made no effort to apply the brakes, and so far as the evidence discloses he did not slow down the automobile before it went off the embankment. His only explanation of why he did not apply his brakes is: "I was in a life and death struggle with the wheel, and if I had released my hold it would have gone further."

The spike which stuck in the tire was not of a type used by the Norfolk and Western Railway Company on that division of its line, and the evidence in no way connects the railway company with this spike. The plaintiff does not contend that the injury to the tire was due to any act of negligence of the railway company; and the court instructed the jury that they could not find a verdict against the railway company because the tire was punctured by this spike.

The plaintiff charges that the railway company was negligent in two particulars, and that these acts of negligence were the proximate cause of this accident. The acts of negligence charged are as follows: .

(1) The railway company failed to construct, maintain and keep in good repair, this crossing, including the approaches thereto, for the *full width of the county road* and for the entire length thereof between the right of way lines of the railroad.

(2) The railway company failed to maintain a barrier along the edge of the roadway on the approaches to prevent automobiles from running off the roadway and over the embankment.

The railway company contends, (1) that it was not guilty of any negligence in either of these particulars; (2) that if it was guilty of negligence in either of these particulars, such negligence was not the proximate cause of the accident; and (3) that Faris himself was guilty of negligence which, if not the sole cause of the accident, contributed thereto and bars his recovery.

It will simplify a discussion of the questions raised in the several assignments of error first to ascertain what statutes apply to this case, and the correct construction of those statutes which do apply.

The plaintiff contends that the duties of the railway company in the instant case are those prescribed by section 3885, Va. Code, 1919, as amended by Acts 1920, p. 411, c. 297, and section 3973, Va. Code, 1919.

The language of section 3885, as amended, makes it plain, we think, that it has no application to a grade crossing existing at the time of the enactment of that statute, where the railway company has not been required to change the crossing to an overhead or underpass crossing, and no change in the crossing has been made necessary by an actual or contemplated change in its works by the railway company. Section 3885 was enacted long after the original construction of this crossing, and has no application to this case.

The statutes prescribing the conditions upon which this crossing might be and was constructed are sections 1094, 1095, Va. Code, 1887, which are quoted in the footnote, *ante*. But as said by Buchanan, J., in *Charlottesville v. So. Ry. Co.,* 97 Va. 428, 34 S. E. 98:

"The duty of the railroad in such a case is a continuing one. It does not fulfil its whole obligation by putting the highway

in such a condition at the time the railroad is built that the crossing does not impair the safety, or impede or endanger the passage or transportation of persons or property along the highway, nor by putting and keeping it in such a condition as would have accomplished that end if the conditions and circumstances, existing at the time the railroad was built had continued. The legislature intended to provide for all time against any obstruction which would impair the safety, or impede or endanger the passage or transportation of persons or property along the highway beyond what is authorized by the statute. If the population of the neighborhood or the use of the highway so increase that the crossing, originally adequate, is no longer so, it will be the duty of the railroad company to make such alteration in the crossing as the changed conditions require."

Section 3973, Virginia Code, 1919, however, applies to grade crossings constructed before the enactment of that statute as well as to crossings thereafter constructed; and is applicable to this case.

"The proposition may be accepted as settled that though crossings have been constructed in a manner approved at the time of their construction, they may, by statutes subsequently enacted, be required to be changed at the expense of the railroads where such changes are in the interest of the public safety or welfare." 22 R. C. L., sec. 42, p. 787.

Section 3973, so far as is here material, reads:

"At every crossing of a county road by a railroad at grade, it shall be the duty of the railroad company to keep such crossing in good repair to the full width of the county road, and to maintain said crossing in a smooth and level condition so as to admit of safe and speedy travel over the same, and it shall also be the duty of the railroad company to maintain and keep in good repair the approaches of all such crossings at grade, for the full width and entire length of the county road between the right of way lines of said railroad."

██ ██ The words "the full width of the county road" as used in section 3973 are open to several constructions. We find no case decided by this court which has construed these words, or which has fixed their meaning by relating them to the particular facts of a, given case; but the words are to be given a reasonable construction in the light of the purpose for which the statute was enacted. *Charlottesville* v. *So. Ry. Co., supra.* When so construed, the true meaning of these words, we think and hold, is the full width of the generally traveled way, which in the case of an improved road means the width of that portion of the roadbed which by its construction is designed and intended to be ordinarily used by persons traveling the road. So construed "road" does not include the ditches or slopes of the shoulders of the road, which, though maintained in such condition that they may be occasionally used by travelers, are not by construction designed or intended for general use.

In *Supervisors* v. *N. & W. Ry. Co.,* 119 Va. 763, at p. 775, 91 S. E. 124, 128, the court says:

"Our conclusion, therefore, is that the width of the public road in question at the time the railway company made changes in its location was confined to and was the width of such road as was in use by the public at that time, including the side ditches and slopes, in addition to the roadbed or traveled portion of the roadway." But the court is here defining the width of the right of way of a road which had been acquired by prescription, and not the width of the road to be maintained as a lane of travel at a railroad crossing.

At the request of the plaintiff the court gave instruction No. 2, which reads:

"The court instructs the jury that it was the duty of the railway company to keep the crossing in question in good repair to the full width of the county road and to maintain said crossing in a smooth and level condition so as to admit of safe and speedy travel over the same, and it was also the

duty of the railway company to maintain and keep in good repair the approaches to and over said crossing for the full width and entire length of the county road between the right of way lines of the said railroad, and in the present case, if the jury believe from the evidence that the railway company failed to maintain the approaches to said crossing to the full width of the county road, but maintained the county road on top of an embankment or fill narrower than the width of the county road beyond the approaches, and that such narrow embankment or fill was a proximate cause of the accident, then you must find for the plaintiff, unless the jury further believe from the evidence that the plaintiff was guilty of contributory negligence as defined in another instruction herein."

The instruction in its essential particulars is given in the language of section 3973, but is defective in that neither it nor any other instruction given defines the meaning of the words "the full width of the county road" as used therein, or relates it to the evidence in the particular case. But this point was not raised by the railway company in the trial court.

The objection made by the railway company is, that there is no evidence to support instruction No. 2. The theory upon which it bases its assertion that there is no evidence in the record to support instruction No. 2, is that there is no evidence in the record to show that the county of Halifax has ever acquired title to a right of way for this road except by prescription; that the title acquired by prescription is limited to the traveled way twelve feet wide in use prior to 1926; that no duty rests upon the railway company to construct a crossing wider than the right of way which the county has for the road; and that all the evidence shows that the crossing, including the approaches, at the time of this accident were wider than the traveled way prior to 1926. This objection to instruction No. 2 is not well made.

Chapter 388, Acts 1908, which was re-enacted without change as section 2015, Va. Code, 1919, and again without

change as section 31 of the general road law, Acts 1928, p. 580, c. 159 (Michie's Va. Code, 1930, section 2039 [32]), provides as follows:

"Where a way has been worked by road officials as a public road and is used by the public as such, proof of these facts shall be *prima facie* evidence that the same is a public road. And where a way has been regularly or periodically worked by road officials as a public road and used by the public as such continuously for a period of twenty years, proof of these facts shall be conclusive evidence that (the) same is a public road. And in all such cases the center of the general line of passage, conforming to the ancient landmarks where such exists, shall be presumed to be the center of the way, and in the absence of proof to the contrary the width shall be presumed to be thirty feet.

"Nothing herein contained shall be construed to convert into a public road a way of which the use by the public has been or is permissive, and the work thereon by the road officials has been or is done under permission of the owner of the servient tenement."

■ The evidence in this case with reference to the use and working of this road as a public road is sufficient under this statute to constitute *prima facie* evidence that this is a public road, and to raise a rebuttable presumption that the road (that is, the right of way) is thirty feet wide; for, as the evidence is merely silent as to the width of the right of way, there is no proof to the contrary. The mere fact that the traveled way was only twelve feet wide and that, where there were drainage furrows, they were only twenty feet apart, does not constitute evidence that the right of way was not or is not thirty feet wide.

■ However, independently of this statute, when a county has improved a county road crossed by a railroad, the court will, in a case brought to recover for an injury to a traveler at such crossing, in the absence of proof to the contrary, pre-

sume that the county has title to the roadway actually improved by it. If it be a fact that the county has no title to a part of the roadway improved, the burden rests upon the railway company to prove that fact.

Counsel for the railway company cites *Supervisors* v. *N. & W. Ry. Co.*, 119 Va. 763, 91 S. E. 124, as having established the law to be contrary to the view above expressed. But the facts in that case were materially different from those in the instant case; and though the statute above quoted was then in effect, it does not seem to have been brought to the attention of the court—certainly it is not referred to in the opinion in that case.

Under its continuing duty under sections 1094, 1095, Code 1887, and section 3973, Code 1919, the duty of the railway company is not fully performed even when it has constructed a crossing to the full width of the then right of way of the road. If the county thereafter acquires a wider right of way and, to meet the needs of the traveling public, constructs a road wider than the old right of way, the railroad must increase the width of the lane of travel across its right of way to conform to the widened roadway.

Instruction No. 2, when "the full width of the county road" is interpreted as it has been above defined, correctly states the law applicable to this case.

However, the court at the request of the railway company gave instruction 1, which reads:

"The court instructs the jury that it was the duty of the defendant railway company to build and maintain the crossing in question and approaches thereto only to the width of the county road as it was at the time the railroad was constructed."

The plaintiff objected to the giving of this instruction, the only ground of objection stated being that "it would tend to mislead the jury unless it is modified so as to be read in con-

nection with the instruction with reference to the continuing duty."

The court should not have given instruction 1. It does not correctly state the law. But having been given, it was necessary to read instruction No. 2 in connection with instruction 1, and to so construe the two instructions as to reconcile them. Instruction No. 2 clearly refers to the road as it existed at the time of the accident, and instruction 1 to the road as it existed when the railroad was built; but there is nothing in the two instructions to indicate that the word "road" is to be given different meanings in the two instructions.

Giving the word "road" the same meaning in the two instructions, they can be reconciled only by construing "road" in both of them to mean the right of way for the road. So construed instruction No. 2 does not correctly state the law. What construction the jury placed upon the word "road" in the two instructions it is not possible to know; but in any event they must have proven confusing to the jury.

The court refused to give instruction J asked for by the railway company, which reads:

"The court instructs the jury that if they believe from the evidence that when the road leading from Lennig to Catawba was rebuilt and reconstructed by the county authorities in 1926 the approaches to this crossing were raised by the county road force under the supervision and direction of the county engineer, in charge of roads, and that the travel over said road has not materially increased since that time, it thereby became the duty of the railway company only to maintain the said approaches as constructed by the county authorities, and if the jury believe from the evidence that the railway company has done this, then it is guilty of no negligence in this case, and no verdict can be found against it."

The court did not err in refusing to give this instruction. Section 3973 imposes a duty on the railway company

to maintain this crossing to the full width of the county road, as these words are above defined; and the county authorities had no power to relieve the railroad of this duty owed to the public either expressly or impliedly by constructing the approaches to the crossing of a less width than is required by the statute, if it has done so. *Southern Ry. Co. v. Comth.,* 124 Va. 36, 97 S. E. 343.

▇ Instruction No. 4 given at the request of the plaintiff reads:

"The court instructs the jury that the railway company is charged with the duty, and the obligation is upon said company, to maintain continuously such approaches as are reasonably necessary to enable travelers to get on and over its crossing in safety, and in the present case, if the jury believe from the evidence that the railway company in maintaining the highway across its right of way maintained same on an unguarded embankment narrower than the road such as under the surrounding circumstances would make it unnecessarily dangerous to travelers unless protected, and that the said railway company failed to erect and maintain proper fences or guard rails or barriers to protect travelers using ordinary care against running over such embankment, and that such failure was a proximate cause of the plaintiff's injury, then they should find for the plaintiff, unless they believe from the evidence that the plaintiff was guilty of contributory negligence as defined in another instruction."

The railway company's objection to the giving of instruction No. 4 was inartificially stated when the instruction was offered; but from all that was said in making the objection, the objection may be fairly said to be that there was no evidence to justify submitting to the jury the question: Was the railway company guilty of negligence in not having erected and maintained barriers or guard rails along the edges of the embankment for the approach to this crossing on the north side? In its motion to set aside the verdict the railway com-

pany states this as its objection with clearness. The objection, we think, was well made.

The uncontradicted testimony of Mr. Duvall and Mr. DeHuff, the resident engineers of the State Highway Commission stationed at Petersburg and Danville, respectively, and of Mr. Micou, the county engineer for Halifax county, is that the customary and approved method of building and maintaining crossings over county highways such as the one in question does *not* require that the fill at this particular crossing be protected by a guard rail. Though Mr. Duvall and Mr DeHuff testify on cross-examination that any fill would be safer with a guard rail.

When the photographs of this crossing which are introduced in evidence, and all the other testimony with reference to the location and construction thereof, is considered, the evidence, we think, clearly fails to show facts and circumstances which required the railway company to erect a barrier or guard rail on this crossing. While any embankment carrying a roadway is rendered safer for travel by a guard rail or barrier, in the absence of a statute specifically requiring embankments at railroad crossings to be protected by barriers, the duty to erect barriers arises only where the embankment is not reasonably safe for travel thereover without such a barrier.

In the instant case, though it may be that the roadway across the right of way of the railway company was not as wide as required by the statute, the roadway was reasonably safe without a barrier; and the railway company was not guilty of any breach of duty or negligence in not having constructed barriers or guard railings at this crossing. The giving of instruction No. 4 was reversible error.

At the request of the plaintiff the court gave instruction 1a, which reads as follows:

"The court instructs the jury that it was the duty of the railway company in constructing and maintaining its works

across the county road at the point of the accident to construct and maintain such a crossing as would not impair the safety or impede or endanger the operations of the road to be crossed, and to support such crossing by such permanent and proper structures and fixtures as would best secure the safe passage and transportation of persons and property along such crossing, and as would not be injurious to the works of the company, and that if it become necessary to alter the county road, it was the duty of the railway company to build and maintain an equally convenient roadway in lieu thereof, and in the present case, if the jury believe from the evidence that the railway, company in crossing the county road at the point of the accident altered the county road and built and maintained the same and the approaches to said crossing upon a fill or an embankment narrower than the road, and left adjoining said road and approaches and contiguous thereto on the right of way of the railway company a declivity or "drop off," which, taken in connection with said embankment and other surrounding conditions shown in the evidence, created such conditions as would materially impair the safety and endanger the traveling public using said crossing, and that the defendant company failed to do so and that such failure was a proximate cause of the injury, then you must find for the plaintiff unless the jury further believe from the evidence that the plaintiff was guilty of contributory· negligence as defined in another instruction."

■ This instruction so intermingles statements relating to the duty of the railway company as to the original construction of the crossing, and statements relating to the duty of the railway company as to the subsequent condition and maintenance of the crossing, that it is confusing. There is no evidenece to show that the railway company in its original construction of this crossing failed to perform its duty as to the construction thereof under sections 1094, 1095, Va. Code, 1887, then in force. Further than this, the evidence does not

show that the way in which this crossing was constructed and maintained "created such conditions as would materially impair the safety and endanger the traveling public using said crossing." If a retrial of this be had, this instruction should not be given.

While it may be that the company has not performed its full statutory duty as to the width of this crossing, we think that it is not possible to escape the conclusion that this crossing, including the approaches thereto, afforded a reasonably safe and convenient crossing at this point over the road. But even though this be true, if the railway company has failed to perform its statutory duty as to the width of the crossing maintained by it, and there was a direct causal connection between this breach of duty and the injury of the plaintiff, it constituted actionable negligence.

The only question of negligence on the part of the railway company presented by this record is, we think, whether the railway company had failed to maintain a lane of travel across its right of way as wide as is required by section 3973; and the instructions should have been limited to it. For this reason instruction No. 3 given at the request of the plaintiff was objectionable.

The railway company assigns as error the action of the court in refusing to give instructions C, X, E, F, H, L, M, and N in the form requested by it. We do not deem it necessary to set forth these instructions at length, or to discuss them further than to say that we think the court did not err in refusing to give these instructions.

Instruction No. 8 given at the request of the plaintiff should have been refused because it embodied in it by reference instructions which we have stated above should not have been given.

Faris was a district game warden employed by the State Commission of Game and Inland Fisheries, whose employees come under the workmen's compensation law (Code

1930, section 1887 [1] *et seq.*). There is evidence in the record tending to show that Faris soon after this accident made a claim for compensation for the injury received by him in this accident, but the evidence does not disclose whether Faris has accepted an award for this injury under the workmen's compensation act or not. If he has accepted an award for such injury this constitutes a bar to the maintenance of this action by him. See *Horsman* v. *R. F. & P. R. Co.*, 155 Va. 934, 157 S. E. 158, decided January 15, 1931, and *Williamson* v. *Wellman*, post 417, 158 S. E. 777, decided March 19, 1931.

The question of the amount of damages which the plaintiff is entitled to recover, if he be entitled to recover anything, appears to have been fairly presented to the jury, and we find no error relating to the amount of the verdict.

Because of the errors above pointed out, and the state of the evidence, we are of opinion that the judgment of the court should be reversed, and the case remanded for a new trial to be had upon the question of the plaintiff's right to recover in this action, but not as to the amount of damages.

*Reversed and remanded.*