# Richmond

### City of Bristol v. Virginia and Southwestern Railway Company, and Southern Railway Company.

March 16, 1959.

Record No. 4873.

Present, All the Justices.

The opinion states the case.

*William H. Woodward* and *Waldo G. Miles* (*Jones, Woodward, Miles & Greiner,* on brief), for the appellant.

*Thomas B. Gay* (*H. Merrill Pasco; George M. Warren, Jr.,* on brief) for the appellees.

Miller, J., delivered the opinion of the court.

In this proceeding the city of Bristol, Virginia, a municipal corporation, hereinafter called the city, seeks to extend Euclid avenue at grade across the tracks and yard of Virginia and Southwestern

Railway Company, under lease to the Southern Railway Company. The city petitioned the State Corporation Commission, hereinafter called the Commission, to certify that a public necessity or an essential public convenience required the street extension, and to approve or revise and approve in accordance with § 4(13) of the city charter, the plans submitted by the city for the construction of the crossing and determine what part of the costs of construction should fairly and reasonably be paid by respondents. It also asked the Commission to certify that public necessity justified or required protection of the public using the crossing, determine whether the plans submitted by the city for protection of the public and operation of the crossing were proper and appropriate, and decide what share of that cost should fairly and reasonably be borne by respondents.

In their answer respondents denied that public necessity or an essential public convenience required extension of Euclid avenue at grade across the tracks and right of way. They also asserted that neither the general statutory law nor § 4(13) of the city charter authorized approval by the Commission of petitioner's plans for the grade crossing which contemplated and required removal and abandonment of some existing tracks and extensive rearrangement of other tracks.

Upon consideration of the rather voluminous testimony and numerous exhibits offered by the litigants and after a personal inspection by Commissioner Dillon of the crossing and area involved, a majority of the Commission decided that the proposed grade crossing was not required by public necessity or as an essential public convenience and the city's petition was denied. The record is now before us for review.

Several assignments of error were made by the city to the decision of the Commission, but the controlling issue presented on this appeal is whether the Commission erred in finding that neither public necessity nor an essential public convenience requires the crossing.

The material parts of § 4(13) of the charter of the city of Bristol, Acts 1954, ch. 581, page 737, at pages 738 and 740, relied upon by the city, read as follows:

"In addition to the powers mentioned in section two hereof, the said city of Bristol shall have the following powers:

\*        \*        \*        \*        \*        \*        \*

"(13) * * * to open, lay out, and improve new streets across the track or tracks, yard or yards, of any railroad in the city, and any such new or existing street or streets may cross any such track or tracks, yard or yards, of any railroads in the city, in the discretion of the council, either at grade, or pass above or below any such existing structure or structures; provided, that after due notice to such railroad company and full opportunity to be heard and after the council shall have decided whether such crossing shall be made at grade, or pass above or below any such existing structure or structures, the plans and specifications for such crossing as the council shall have determined upon, shall be submitted to the principal agent of such railroad company in the city, and in the event the city and railroad company cannot within sixty days thereafter agree upon such plans and specifications, or cannot agree in regard to the division of the cost of constructing such crossing, then the city shall submit such plans and specifications to the State Corporation Commission, and the State Corporation Commission, after reasonable notice to such railroad company and after hearing such evidence as either party may adduce shall approve, or revise and approve, the plans for such crossing as the council shall have determined shall be made or substitute such other plans or character of crossing, whether at grade, overhead or underpass as the State Corporation Commission may deem proper under all the facts, circumstances and conditions in the case, and the State Corporation Commission shall determine what part of the cost of constructing such crossing shall fairly and reasonably be paid by the city, if any, and what part by the railroad company * * *."

Although it is not specifically alleged in the petition, it is apparent that the city's request for certification that public necessity or essential public convenience requires the street extension and determination of what part of the costs of constructing the crossing should be borne by respondents is sought pursuant to § 25-233, Code 1950, for the authority of the city under § 4(13), *supra*, to construct the crossing is subject to the provisions of that Code section which follows:

"No corporation shall take by condemnation proceedings any property belonging to any other corporation possessing the power of eminent domain, unless, after hearing all parties in interest, the State Corporation Commission shall certify that a public necessity or that an essential public convenience shall so require, and shall give its

permission thereto; and in no event shall one corporation take by condemnation proceedings any property owned by and essential to the purposes of another corporation possessing the power of eminent domain."

It is likewise apparent that certification by the Commission that public necessity requires protection for those using the crossing and determination of what share of the costs of such protection should be borne by respondents is sought under § 56-406.1, 1958 Cum. Supp., Code 1950, which provides for the installation of automatically operated gates, wigwag signals, other electrical devices or manually operated gates at railroad crossings.

Bristol, Virginia, and Bristol, Tennessee, are adjoining cities and the state line is located in the center of State street. It extends in an easterly and westerly direction and is the main arterial thoroughfare for the two municipalities. The geographic area of Bristol, Virginia, which lies to the north of the center of State street, is 4.43 square miles and its present population is approximately 18,000. The area of Bristol, Tennessee, is about 5 square miles and its population at the last census was in excess of 16,000.

The railway tracks of the Virginia and Southwestern Railway Company, under lease to the Southern Railway Company as a part of its Appalachia division, run northwardly from the southern limits of the city of Bristol, Virginia, to its northern limits along a course slightly west of Commonwealth avenue. Commonwealth avenue, one of the main thoroughfares in the city, likewise extends from beyond the southern limits of the city practically to its northern boundary.

Northwardly from State street, which is 44 feet wide from curb to curb and crosses the railroad from east to west, to Spurgeon lane, which also crosses the railroad right of way from east to west in the northern area of the city, is a distance of 1.07 miles. Spurgeon lane crosses the right of way where there is only one track and connects with Commonwealth avenue east of the track, thus affording access and passage across the railroad in that part of the city. There is no street that crosses the railroad right of way between Spurgeon lane in the northern section of the city and State street along its southern limits. Euclid avenue, with a right of way 90 feet wide, runs northeast and southwest and extends a considerable distance through the city on each side of the railroad. The proposed extension or link to connect these sections of Euclid avenue across the railroad tracks is approximately midway between State street and

Spurgeon lane, though slightly nearer to Spurgeon lane. South of State street in Bristol, Tennessee, several streets cross the right of way and to the north of Spurgeon lane the track is also crossed by another road or street affording access to and from that area, and on northwardly beyond the city limits.

Approximately thirty per cent of the geographical area of Bristol, Virginia, lies west of the railroad tracks and one-fourth of the population of the city resides in that area. The city high school and the junior high school are located east of the tracks and all municipal buildings, with the exception of the health department maintained by the city, are located east of the railroad though the Bristol Memorial Hospital and many of the offices of local physicians are located to the west of the tracks. A large number of the residents of the city are employed in areas that lie across the tracks from where they live. The evidence discloses that State street is the heaviest traveled artery serving the two cities, and traffic on State street slightly west of Commonwealth avenue is in excess of 16,000 vehicles a day and at times congested.

In 1950 an exhaustive traffic survey was made in the Bristol area by the State Highway Departments of Virginia and Tennessee. Their survey and recommendations published in 1952 in booklet form proposed and recommended, *inter alia,* that a grade crossing be established at Euclid avenue. The survey, however, recognized the traffic hazard that would result from a grade crossing and recommended a separation of grade structure at the earliest possible time. The survey also recommended that the western end of Euclid avenue be extended so as to connect with State street near the western edge of the city. East of the railroad Euclid avenue would intersect Commonwealth avenue as it now does and thus afford a midtown thoroughfare for traffic across the track and through the city and relieve the congestion on State street.

The Southern Railway Company maintains and operates a classification yard which embraces the area within the proposed crossing. The southern extremity of the yard begins a little to the north of State street and the yard extends northwardly to a point slightly beyond Euclid avenue. The area over which Euclid avenue is sought to be extended includes a section of the northern part or "throat" of the yard, which is in active daily use.

In the majority opinion written by Commissioner Dillon, the location of the several railroad tracks, their character and the uses to

which devoted, the varied activities carried on in the freight classification yard, the amount of railroad traffic over the proposed crossing during certain daily and hourly intervals, and the resultant danger to the public and employees of the railroad who would use the crossing, as established by the evidence, are well described and clearly stated as follows:

"The testimony and exhibits establish that the point at which it is proposed to open the grade crossing is a critical point in the operation of the Railroads' freight classification yard in Bristol. If Euclid Avenue is extended across this yard, as proposed, it would cross six tracks which are in active use in the daily operation of the railroads, and two additional tracks not presently used. One of the six tracks is the main line track from Appalachia to Bristol; another is the interchange track between this yard and the main line tracks of the Norfolk & Western Railway Company and the Southern Railway Company, Knoxville Division; a third is the ladder track of the classification yard from which many storage tracks spring which are used for classifying freight cars in the making up and breaking up of trains and cuts of cars; the remaining three tracks provide connections with the several industrial tracks in the area.

"In this classification yard Southern Railway Company's daily train from Appalachia to Bristol is broken into cuts of cars for local industries or to be forwarded on the interchange track for delivery on industrial tracks elsewhere in the City or for forwarding south of Bristol on the Knoxville Division of the Southern Railway or east of Bristol on the Norfolk & Western Railway Company. The daily freight train destined to Appalachia is also made up in this yard. In addition, all cars coming to this yard each day on the interchange track from the Norfolk & Western Railway Company or Knoxville Division of the Southern Railway Company for consignees served by the industrial tracks springing off of the classification yard or for forwarding on the Appalachia line are classified there for further handling.

"All trains and cuts of cars coming into the yard must pass over the crossing proposed by the City. In addition, the classification of each car requires it to be brought in on the ladder track across the point of crossing and switched into one or more of the storage tracks springing off of the ladder track. The evidence establishes that there is a substantial amount of shifting of cars and locomotives back and forth across the site of the proposed street crossing between 7:30

A. M. and 3:30 P. M. daily except Sunday. Included in this shifting are a number of cars not attached to locomotives. This is made possible because the 'hump' or high point on the yard is south of the proposed crossing, permitting the movement of cars by gravity northward from the 'hump' onto the classification tracks.

"In addition to the shifting across the point of crossing incident to the classification of cars, it is necessary to cross that point with the locomotive and caboose of incoming and outgoing trains from Appalachia and with cars going in and out of the interchange track. The evidence established that often the outgoing train to Appalachia was made up of such a large number of cars that it was necessary for it to be made up in two sections on the classification tracks and then assembled as a unit on the main line track where it was in position for as much as fifteen minutes while the air brakes were tested on the entire train. Compliance with the state statute prohibiting the blocking of a crossing for more than five minutes at a time would thus render it impossible to make up the outgoing train to Appalachia if the proposed crossing is opened.

"The extent of the railroad traffic over the proposed crossing is indicated by the count for a full week's period set forth in Exhibit 17 which discloses a total of 409 separate train or car movements. In these movements, 2,126 cars passed the proposed crossing and a locomotive passed the crossing during that period 395 times. The average number of separate movements during the eight-hour period when the yard is in operation is approximately 68 per day. On some days the average is as high as 96.

"The record establishes that 9300 vehicles per day, both passenger and industrial, and 213 pedestrians can reasonably be expected to use the crossing if it is opened, and while it may be possible for the railroad to reduce the number of movements across the proposed crossing in the event the street were opened, it does not appear that this number could be reduced materially."

The standard to be applied by this court in reviewing the action of the Commission is stated in § 156(f) of the Constitution of Virginia as follows:

"* * * The appellate court shall have jurisdiction, on such appeal, to consider and determine the reasonableness and justness of the action of the Commission appealed from, as well as any other matter arising under such appeal; provided, however, that the action of

the Commission appealed from shall be regarded as prima facie just, reasonable and correct, * * *."

We have commented upon and applied this provision of the Constitution in numerous cases, among which are the following:

"The principles which govern a review of the order and finding of the State Corporation Commission have often been stated. The findings of the Commission must be regarded by us as *prima facie* just, reasonable and correct, and can not be upset in the absence of a showing of an abuse of the discretion vested in it by statutory and constitutional provisions. Constitution of Virginia, § 156(f). *Petersburg, etc., Railway Company* v. *Commonwealth,* 152 Va. 193, 200, 146 S. E. 292." *Atwood Transport Co.* v. *Commonwealth,* 197 Va. 325, 88 S. E. 2d 922.

"The Constitution provides, with respect to appeals of this character, that 'the action of the commission appealed from shall be regarded as *prima facie* just, reasonable and correct.' Particularly should weight be attached to the findings of the commission in a case in which, in addition to taking, weighing and passing on conflicting testimony, that tribunal visits the locality concerned in the effort to reach an appropriate finding on the merits. * * *" *Southern Railway Co.* v. *Commonwealth,* 128 Va. 176, 201, 105 S. E. 65. *Norfolk & Western Ry. Co.* v. *Interstate Railroad Co.,* 114 Va. 789, 76 S. E. 940; *Southern Railway Co.* v. *Commonwealth,* 196 Va. 1086, 86 S. E. 2d 839.

That the Commission weighed the conflicting evidence and gave careful consideration to the various factors pertinent to a decision of the issues before it is made manifest from the following quotation from Commissioner Dillon's opinion:

"We recognize that the opening of the proposed crossing could, to some extent, facilitate the flow of traffic in Bristol and provide a shorter way to various parts of the City than is now available to a great part of the population, but the evidence clearly establishes that the volume and nature of vehicular and pedestrian traffic reasonably to be expected over the crossing would create a situation of such great hazard and danger to the public and employees of the railroad as to far outweigh any public convenience which would be served by the installation of the crossing. * * *

   *     \*     \*     \*     \*     \*     \*

"Even if we were to disregard public safety, which we cannot do,

it is perfectly apparent from the undisputed facts in this case that if the proposed grade crossing is constructed one of two things must happen: (1) Either the railroad must substantially reduce its operations at its yard, or, (2) The crossing will be closed so much by reason of the railroad's operations that it will not substantially benefit the public and will be a source of annoyance and inconvenience to the public. As has been stated, it is to be expected that the crossing will be closed 68 times a day because of train movements. If 9300 vehicles are to cross the tracks in a day, this means that a substantial number of vehicles will be stopped during each of these closings and must remain backed up until the crossing can be cleared. We do not feel that it is in the public interest to require the railroad to curtail its operations at this yard, nor do we believe it in the public interest to permit the establishment of a grade crossing which cannot serve the public in an efficient manner."

In *Richmond, Fredericksburg & Potomac Railroad Co.* v. *Johnston,* 103 Va. 456, 461, 49 S. E. 496, recognition of danger to the public, at what would have been a much traveled crossing if established, as an important factor to be considered in determining whether to grant an application to construct a public thoroughfare at grade across an actively used railroad yard and line tracks is stated thus:

"* * * It is a matter of common knowledge that grade crossings are the cause of a large portion of the accidents which put life and property in jeopardy. How much more dangerous would be the passage along a broad thoroughfare or boulevard intended especially as a pleasure drive, which crosses at grade not only the ordinary business tracks of the railroad, but the numerous switches covering the yard of a railroad company used for storing and shifting its cars and making up its trains. It does not require the testimony of expert witnesses, for it is a matter of common knowledge that the use of the thoroughfare and of the railroad under such conditions would each be attended with constant and inevitable danger."

The evidence is ample to support the factual findings and the conclusion of the Commission, and under the provisions of § 156(f) of the Constitution and well established principles of law, we should not disturb the decision.

*Affirmed.*