596 F.2d 1186
 The COUNTY OF PATRICK, VIRGINIA, Groundhog Mountain Property
Owners, Inc., C. I. Mortgage Group, a Massachusetts Real
Estate Investment Trust, Mutual Savings and Loan of
Virginia, Doe Run Lodge Properties, and Doe Run at Groundhog
Mountain, Inc., Appellants,
v.
UNITED STATES of America, IBLM, Director, National Park
Service, Joe Brown, Regional Superintendent,
National Park Service, Appellees.
 No. 78-1215.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 5, 1978.
Decided April 20, 1979.
 
 Robert W. Mann, Martinsville, Va. (Young, Kiser, Haskins, Mann, Gregory & Young, Ltd., Martinsville, Va., on brief), for appellants.
 E. Montgomery Tucker, Asst. U. S. Atty., Roanoke, Va. (Paul R. Thomson, Jr., U. S. Atty., Roanoke, Va., on brief), for appellees.
 Before WIDENER and HALL, Circuit Judges, and HOFFMAN,* District Judge.
 WIDENER, Circuit Judge:
 
 
 1
 Alleging wrongful interference by the United States with their use and enjoyment of an appurtenant easement, the County of Patrick and certain property owners, including mortgage holders, along the Blue Ridge Parkway near Station 1275 (appellants) brought an action to quiet title, pursuant to 28 U.S.C. § 2409a, in the United States District Court for the Western District of Virginia. County of Patrick, Va. v. United States, 444 F.Supp. 132, 133 (W.D.Va.1978). Appellants moved for summary judgment pursuant to FRCP 56 on the ground that there was no genuine issue of material fact to be resolved and that they were entitled to judgment as a matter of law. The district court filed an opinion and entered summary judgment, Sua sponte, in favor of the United States. 444 F.Supp. at 135. Appellants contend that the district court erred both in not entering summary judgment in their favor and in entering summary judgment in favor of the United States.
 
 
 2
 The pertinent facts follow. On June 15, 1937, W. R. Quesinberry, a predecessor in title to the landowners,
 
 
 3
 "conveyed to the Commonwealth of Virginia, for Parkway right-of-way, a strip or parcel of land containing 15.21 acres together with all right, title and interest of the said grantor or his assigns to construct or use any access road, drive or way on or over the tract or parcel of land therein conveyed except one (1) such access road, drive or way not exceeding ten (10) feet in width from adjoining land on the south (left) side to Route 608, intersecting the Blue Ridge Parkway motor road at or near Station 1275 k 00." 444 F.Supp. at 133.
 
 
 4
 On May 10, 1938, the property acquired from W. R. Quesinberry was conveyed by the Commonwealth of Virginia to the United States, subject to a reservation on behalf of W. R. Quesinberry that provided for an easement
 
 
 5
 "10 ft. wide, crossing at grade, approx. 450 ft. long, from adjoining land on the south side to Route C-608," ("At or near Survey Sta. 1275 k 00")
 
 
 6
 The government does not question any difference in the wording of the deeds from Quesinberry to the Commonwealth and from the Commonwealth to the United States, as well it might not, for the government has no rights it did not acquire under the deed from the Commonwealth. In addition, the reservation in the Quesinberry deed is plainly to construct an "access road, drive or way on or over the tract or parcel" conveyed, such tract or parcel being the Blue Ridge Parkway right of way. Later in 1938, construction of the Blue Ridge Parkway over the property acquired from W. R. Quesinberry was begun. From 1938 until 1973, the landowners and their predecessors without let or hindrance used the access road provided for in the deeds located at Station 1275 for direct access both to State Route 608 and the Blue Ridge Parkway. That road traversed the easement that was reserved to Quesinberry, his successors and grantees, in the 1937 and 1938 deeds, and crossed, at grade level, the Blue Ridge Parkway.
 
 
 7
 In 1973, the United States constructed an entranceway from the landowners' property to the Blue Ridge Parkway approximately fifty feet south of appellants' easement. Soon thereafter, the United States constructed an underpass crossing at Station 1275 where the access road traversed the Blue Ridge Parkway. The underpass had no adjoining ramps or other entranceways to the parkway at or near that point and thereby eliminated access from the easement to the Parkway but preserved the access to State Route 608. On December 20, 1976, the United States posted notice of its intention to close permanently the entranceway that it had established fifty feet south of the easement. Thus, the landowners no longer had access to the Blue Ridge Parkway from their easement. It seems to be admitted they would have to travel approximately one and one-half miles from Station 1275, in either a northerly or southerly direction, in order to gain access to the Parkway. We do not think this is "at or near Survey Sta. 1275 k 00."
 
 
 8
 In the court below, appellants contended that the construction of the underpass crossing at Station 1275, in conjunction with the closing of the entranceway to the Parkway fifty feet south of the access road, constituted a taking of property without due process of law. Appellants maintained that the clear language of the 1937 and 1938 deeds "intersecting the Blue Ridge Parkway motor road . . . crossing at grade" reserved to them an unrestricted easement that provided them with access to both State Route 608 and the Blue Ridge Parkway. The district court determined that although the language of the 1937 and 1938 deeds was clear, those deeds did not grant the landowners any rights other than that of access from their property to State Route 608. That court concluded that the landowners' right of access to State Route 608 was preserved by the underpass crossing constructed at Station 1275. Consequently, it entered summary judgment in favor of the United States.
 
 
 9
 "In reviewing the propriety of a summary judgment, it is our responsibility to determine whether there was any issue of fact pertinent to the ruling and, if not, whether the substantive law was correctly applied. . . . Thus, to be upheld, the summary judgment under review must withstand scrutiny on both its factual and legal foundations."
 
 
 10
 Bloomgarden v. Coyer, 156 U.S.App.D.C. 109, 114-15, 479 F.2d 201, 206-07 (1973). See also Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); 6 Moore's Federal Practice P 56.27(1), at 1554-55 (2d ed. 1976).
 
 
 11
 Although the district court's decision withstands scrutiny of its factual foundation, it does not with respect to its legal conclusion. In accordance with the applicable substantive law, we are of opinion the district court should have entered summary judgment in favor of appellants as to their rights under the deeds.
 
 As the district court correctly stated:
 
 12
 "Where an easement has been granted or reserved by deed, (in which the language is not ambiguous) the ordinary rule which governs in the construction of other writings prevails, namely, that the rights of the parties must be ascertained from the words of the deed, and the extent of the easement cannot be determined from any other source."
 
 
 13
 County of Patrick, 444 F.Supp. at 134, quoting Cushman Virginia Corp. v. Barnes, 204 Va. 245, 251, 129 S.E.2d 633, 639 (1963). In the instant case, the pertinent words contained in the deeds are "intersecting the Blue Ridge Parkway motor road . . . crossing at grade." Inasmuch as these words are unambiguous, the nature and extent of the easement must be determined by defining those words.
 
 
 14
 While the word "intersecting" has been used in Virginia cases and statutes as referring to two or more streets, roadways, etc., that cross each other on the same plane or level, see, e. g., Remine v. Whited, 180 Va. 1, 6, 21 S.E.2d 743, 745 (1942), and such may well have been meant when the deeds were made, we do not depend upon that construction for we take notice of the tendency in more recent years to eliminate grade crossings from highways. Although the Virginia court may not have defined "crossing at grade," the meaning of "crossing at grade" is unmistakable from the context in which it has been used in numerous cases. It is not even subject to arguable ambiguity. See, e. g., City of Bristol v. Virginia & S. W. Ry. Co., 200 Va. 617, 107 S.E.2d 473 (1959); Norfolk & W. Ry. Co. v. Epling, 189 Va. 551, 53 S.E.2d 817 (1949); Southern Ry. Co. v. Commonwealth, 159 Va. 779, 167 S.E. 578 (1933); Norfolk & W. Ry. Co. v. Faris, 156 Va. 205, 157 S.E. 819 (1931); Richmond, F. & P. R. Co. v. City of Richmond, 145 Va. 225, 133 S.E. 800 (1926). It is clear that "crossing at grade" means crossing, via a roadway, footpath, etc., at the same level as the roadway, railroad tract, etc., it crosses. See, e. g., Norfolk & W. Ry. Co. v. Epling, 189 Va. at 553, 53 S.E.2d at 818; Norfolk & W. Ry. Co. v. Faris, 156 Va. at 209, 212, 157 S.E. at 820-21. No legal definition, indeed, seems to have grown up at variance with the ordinary English meaning: "AT GRADE Adv 1: on the same level used of highways, railroad tracks, pedestrian walks, or combinations of these at the point where they intersect." Webster's Third New International Dictionary, 1971, p. 984.
 
 
 15
 It is equally clear that the term "crossing at grade" does not encompass any type of overhead or underpass crossing. See, e. g., City of Bristol v. Virginia & S. W. Ry. Co., 200 Va. at 618-19, 625, 107 S.E.2d at 474, 478; Southern Ry. Co. v. Commonwealth, 159 Va. at 785, 167 S.E. at 578-79; Richmond, F. & P. R. Co. v. City of Richmond, 145 Va. at 253, 133 S.E. at 808. In City of Bristol, the court cited a section of a municipal charter dealing with a railway crossing of a city street "either at grade, or pass(ing) above or below any such existing structure or structures." 200 Va. at 618-19, 107 S.E.2d at 474. Similarly, the court cited a State Highway Department report distinguishing between a "grade crossing" and a "separation of grade structure." In Southern Ry. Co., the court cited a section of a state statute that provided that "Whenever the elimination of an existing crossing at grade of a State road by a railroad, or a railroad by a State road, and the substitution therefor of an overhead or underpass crossing becomes . . . necessary . . . the State highway commissioner shall notify . . . the railroad company." 159 Va. at 785, 167 S.E. at 578-79. And, in Richmond, F. & P. R. Co., the court, in describing a municipal statute on improvements of crossings, stated: "It did not limit or restrict the character of the improvement. It might be the repair of reconstruction of a crossing at grade, or it might involve an overhead or underpass crossing." 145 Va. at 253, 133 S.E. at 808. Thus, the statutory use of the term "crossing at grade" and the courts' description of that term have been consistent in differentiating between a crossing at grade and an overhead or underpass crossing, the former referring solely to a crossing at the same level of roads, highways, railways, etc. We are thus of opinion, pursuant to the clear language of the 1937 and 1938 deeds, that the landowners are entitled to a crossing at or near Station 1275 k 00 that is on the same level as the Blue Ridge Parkway.
 
 
 16
 The district court concluded that the construction of the underpass crossing by the United States at Station 1275 was not an interference with landowners' easement that was actionable at law or in equity. County of Patrick, 444 F.Supp. at 135. The court stated:
 
 
 17
 "The question of whether particular alteration is permissible in each case depends upon whether the alteration is material, and materiality is determined from whether or not 'the alteration is so substantial as to result in the creation and substitution of a different servitude from that which previously existed(.)' "
 
 
 18
 Id. Since the district court concluded that the easement did not provide the landowners with any right of access to the Blue Ridge Parkway, it deemed the underpass crossing an immaterial alteration.[1] Id.
 
 
 19
 We are of opinion the district court erred in concluding that landowners had no right of access to the Blue Ridge Parkway via their easement and therefore was also in error in concluding that the underpass crossing constructed by the United States at Station 1275 was an immaterial alteration of their easement. In reaching its conclusion on the right to access issue, the court stated:
 
 
 20
 "The Court has determined that although its language is clear, the deed granted to (landowners) no rights of access to the Parkway motor road by virtue of their right to cross the '(l)and . . . (c)onveyed' in reaching Route 608. The deed nowhere provides for access to the Parkway motor road, and certainly, it cannot be implied from the grant. Had the parties intended for the owners of the dominant tract to have had access to that road they could have said so. While it is true that unless specifically limited by the reservation the easement can be used for any purpose to which the dominant tract may reasonably be dedicated it does not follow that this use includes the right to use the Parkway motor road."
 
 
 21
 Id. at 134-35. We believe that the district court's formulation of the applicable substantive law on the right to access issue was incorrect.
 
 
 22
 United States v. Parkway Towers, Inc., 282 F.Supp. 341 (E.D.Va.1968), aff'd, 405 F.2d 500 (4th Cir. 1969), is dispositive of the right to access issue.[2] In that case, one Hitchens had conveyed a strip of land to the United States for use as a parkway. The conveyance left Hitchens with property on both sides of the proposed parkway. The court was called upon to determine the nature and extent of an easement that was reserved to Hitchens in the following language:
 
 
 23
 "It is understood and agreed, however, that the grantor, A. W. Hitchens, does expressly reserve unto himself, his heirs, assigns and successors in title, a perpetual easement or right of way, for vehicular and foot travel, of a width of thirty feet, over, through and across the above described parcel of land, which shall be located at a point to be mutually agreed upon between the parties hereto, having due regards for the purposes and uses of each party, and convenience of approach."
 
 
 24
 Id. at 342.
 
 
 25
 The United States contended that the easement was reserved for the sole purpose of permitting Hitchens access from his property on the north side of the strip of land conveyed to the United States to his property on the south side of the strip. Id. Hitchens' successors in title maintained that the easement was intended and did provide it with access to and from the Parkway. Id. The court stated:
 
 
 26
 "The language in the easement is clear. It reserved to Hitchens, his heirs, assigns and successors in title, a perpetual easement or right of way, for vehicular and foot travel, over, through and across the 500 foot strip. . . . Nothing in the instrument says the easement is solely for access from one parcel to the other . . . If such had been the intention of the parties, it would have been easy for them to so state in simple language. Where an easement is granted (or reserved) it may be used for any purpose to which the property for whose benefit the easement exists may then, or in the future, reasonably be devoted, unless the grant or reservation specifically limits the use; ([3] that is, the holder of the easement is entitled to do what is reasonably necessary to enjoy the full rights established by the easement. . . . Nothing in the language reserving the easement limited Hitchens or his successors to the use they could make of the property. . . . Since the language of the easement is clear; a roadway in fact existed in the easement and was used for access from the Parkway; and until 1966 31 years after its establishment 'no objection was made concerning the use of this claimed easement,' I am of opinion the right to use the easement for ingress and egress to and from the paved Parkway to defendant's property still exists."
 
 
 27
 Id. at 343-44.
 
 
 28
 We believe the facts of the case before us provide as strong, if not a stronger, basis than the facts in Parkway Towers, Inc., to support a finding that landowners' easement provides them with a right of access to the Blue Ridge Parkway. The pertinent language in the 1937 and 1938 deeds is clear. It reserved to Quesinberry the right to construct or use an access road over the parcel of land conveyed to the United States "intersecting the Blue Ridge Parkway motor road . . . crossing at grade (at or near Station 1275)." County of Patrick, 444 F.Supp. at 133. Nothing in either the 1937 or 1938 deed says that the access road is solely for access from Quesinberry's property to State Route 608. If such had been the intention of the parties, it would have been easy for them to so state in simple language. As previously stated, where an easement is reserved it may be used for any purpose to which the property for whose benefit the easement exists may reasonably be devoted, unless the reservation specifically limits the use. Nothing in the language of the 1937 and 1938 deeds reserving the right to construct or use an access road on or over the Blue Ridge Parkway at or near Station 1275 limited Quesinberry or his successors in the use they could make of the access road. Therefore, since the language creating the easement is clear, and since the access road in fact existed and was used for access to and from the Blue Ridge Parkway for about 38 years without objection after the establishment of the Blue Ridge Parkway, we are of opinion the landowners possess the right to use the access road for ingress and egress to and from the Blue Ridge Parkway.[4] The district court should have entered partial summary judgment in favor of appellants on this aspect of the case.
 
 
 29
 Accordingly, the judgment of the district court is vacated and the case remanded for proceedings not inconsistent with this opinion.
 
 
 30
 VACATED AND REMANDED.
 
 
 
 *
 Eastern District of Virginia, sitting by designation
 
 
 [1]
 The district court concluded that the underpass crossing preserved all of the landowners' rights pursuant to their easement, i. e., the underpass crossing preserved access from their property to State Route 608. 444 F.Supp. at 136
 
 
 [2]
 As in Parkway Towers, we do not have before us the question of any right the United States may have to limit access to the Blue Ridge Parkway, or under what conditions, if any, access may be eliminated. The only question before us is whether the landowners had such right of access under the deeds involved which we hold they do have
 Also, we do not construe Parkway Towers as basing its holding upon an easement by prescription. Our opinion here is not so based. The use of the easement for access for about 38 years, however, shows very nearly conclusively how the parties construed the language in the deeds, even should it need construction, which we hold it does not.
 
 
 [3]
 Citing Cushman Virginia Corp. v. Barnes, 204 Va. 245, 129 S.E.2d 633, 639 (1963)
 
 
 [4]
 Pursuant to 28 U.S.C. § 2409a(b), within sixty days of the disposition of this case on appeal, the United States may elect to continue to deny access to the Blue Ridge Parkway via the access road located at or near Station 1275 upon payment of just compensation